Filed 3/9/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, INC. et al., <br><br> Petitioners, <br><br> v. <br><br> PUBLIC UTILITIES COMMISSION, <br><br> Respondent; <br><br><br> PACIFIC GAS AND ELECTRIC COMPANY et al., <br><br> Real Parties in Interest. | A167721 <br><br> (Cal.P.U.C. Dec. No. 22-12-056) |

For over 30 years, California has used a net energy metering (NEM) tariff that allows public utility customers with renewable electrical generating facilities to receive credit on their electric bills for excess energy exported to the power grid.  (Pub. Util. Code, § 2827, added by Stats. 1995, ch. 369, § 1; undesignated statutory references are to this code.)  In 2013, the Legislature enacted section 2827.1, directing the Public Utilities Commission (Commission) to develop a successor tariff.  (Stats. 2013, ch. 611, § 11.)  Under then-existing law, NEM customers received credit at the full retail rate — including certain fixed costs of the exported energy — resulting in a "substantial subsidy" to those customers and a shifting of costs to non-NEM customers.  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis

1

of Assem. Bill No. 327 (2013–2014 Reg. Sess.) as amended Sept. 6, 2013, p. 7 (Sen. Analysis).)  By enacting section 2827.1, the Legislature directed the Commission to ensure the successor tariff "is based on the electrical system costs and benefits received by nonparticipating customers" and "prevents a cost shift to non-NEM customers." (Sen. Analysis, at p. 4.)

In 2022, the Commission adopted a successor tariff in its *Decision Revising Net Energy Metering Tariff and Subtariffs* (2022) Cal. P.U.C. Dec. No. 22-12-056 (Decision).  Petitioners Center for Biological Diversity, Inc., Environmental Working Group, and The Protect our Communities Foundation (collectively, petitioners) filed a petition for writ review in this court, contending the successor tariff was inconsistent with section 2827.1. We granted the petition and affirmed the Decision.  (*Center for Biological Diversity, Inc. v. Public Utilities Com.* (2023) 98 Cal.App.5th 20, review granted Apr. 10, 2024, S283614 (*CBD I*).)

The California Supreme Court granted review and addressed an issue it acknowledged petitioners had failed to raise in our court: whether the "highly deferential" approach of *Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406 (*Greyhound*) applies to the Commission's interpretation of the Public Utilities Code.  (*Center for Biological Diversity, Inc. v. Public Utilities Com.* (2025) 18 Cal.5th 293, 301 (*CBD II*).)  The court concluded it does not, and it reversed and remanded the matter to this court to address in the first instance whether the successor tariff should be upheld under the standard set forth in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th at page 1 (*Yamaha*).  (*CBD II*, at p. 309.) After applying that standard here, we again affirm the Decision.

## BACKGROUND

The supply of power generated by renewable systems is neither constant nor consistent. Solar panels, for example, may generate electricity only when the sun shines, and the amount of power they generate depends on the intensity of the sunlight. They "may generate less—or more—electricity than their owners need at a particular time. At night or on a cloudy day, for example, a utility customer with solar panels may need to draw additional electricity from the power grid. On a sunny morning, by contrast, the panels may generate more electricity than the customer needs, allowing the customer to export excess energy to the grid." (*CBD II*, *supra*, 18 Cal.5th at p. 299.)

The Legislature has required utilities to compensate eligible "customer-generators" for energy those customers export since the enactment of section 2827 in 1995. (§ 2827, subd. (b)(4)(A); *CBD II*, *supra*, 18 Cal.5th at p. 299; Legis. Counsel's Dig., Sen. Bill No. 656, Stats. 1995 (1995–1996 Reg. Sess.) Summary Dig.) The program was expected to "encourage substantial private investment in renewable energy resources, stimulate in-state economic growth, reduce demand for electricity during peak consumption periods, help stabilize California's energy supply infrastructure, enhance the continued diversification of California's energy resource mix, reduce interconnection and administrative costs for electricity suppliers, and encourage conservation and efficiency." (§ 2827, subd. (a).)

The Commission created the first NEM tariff (NEM 1.0) pursuant to section 2827. Under NEM 1.0, residences with solar power systems[1] were

---

[1] Originally, the NEM tariff required by section 2827 applied only to solar power systems operated by an electric utility's residential customers. (Former § 2827, subd. (b).) The tariff now applies to any "renewable electrical generation facility" with a total capacity of one megawatt or less

3

allowed to install an electricity meter that measured the difference between the quantity of electricity supplied to the residence by the utility and the quantity of electricity supplied to the grid by the residence — hence the name, "net energy metering." (Former § 2827, subds. (c), (d).) The residence was charged only for this difference — i.e., the *net* use of electricity from the grid. (*Id.*, subd. (f)(2).) By offsetting exported power with imported power, NEM 1.0 functionally required utilities to purchase excess power at the price paid by the customers for electricity. (*CBD II*, *supra*, 18 Cal.5th at p. 299.)

Almost two decades later, the Legislature instructed the Commission to revisit the compensation for consumer-generators by enacting section 2827.1. (*CBD II*, *supra*, 18 Cal.5th at p. 300, citing Stats. 2013, ch. 611, § 11, pp. 5030–5031.) A bill analysis identified a more specific purpose: "to ensure that the [successor tariff] is based on the electrical system costs and benefits received by nonparticipating customers and prevents a cost shift to non-NEM customers." (Sen. Analysis, *supra*, at p. 4.)

Under NEM 1.0, consumer-generators had received bill credit at the full retail rate. (Sen. Analysis, *supra*, at p. 7.) Because this rate included certain fixed costs, like transmission and distribution costs, NEM customers were receiving a "substantial subsidy," thereby shifting costs to non-NEM customers. (*Ibid.*) A bill analysis observed that "transmission and distribution costs are typically one-half to two-thirds of a residential customer's billing." (*Ibid.*) It thus estimated that full retail NEM "comes at a cost of approximately $60 million to non-NEM customers across the state." (*Ibid.*) While the Legislature had "in the past justified this subsidy as it stimulates the solar industry, helps the state reach its renewable energy

operated by a utility customer, regardless of the way the power is generated or the nature of the customer. (§§ 2827, subd. (b)(4)(A), 2827.1, subd. (a).)

4

goals, and provides other external benefits," the Legislature now directed the Commission to develop a successor tariff that "prevents a cost shift to non-NEM customers." (*Id.* at pp. 7, 4.)

As relevant here, section 2827.1, subdivision (b) (section 2827.1(b)) identifies three objectives the Commission must ensure in developing the successor tariff. The Commission must (1) ensure that the successor tariff "ensures that customer-sited renewable distributed generation continues to grow sustainably," and include "specific alternatives designed for growth among residential customers in disadvantaged communities" (*id.*, subd. (b)(1)); (2) ensure that the successor tariff be "based on the costs and benefits of the renewable electrical generation facility" (*id.*, subd. (b)(3)); and (3) ensure that the "total benefits" of the successor tariff "to all customers and the electrical system" are "approximately equal to the total costs" (*id.*, subd. (b)(4)). Section 2827.1(b) also allows the Commission to revise the successor tariff "as appropriate to achieve the objectives of this section."

The Commission adopted a revised tariff (NEM 2.0) in 2016 as an interim measure to address some of the concerns about cost-shifting under NEM 1.0. NEM customers continued to receive full retail rate credit but were charged a onetime interconnection fee and other periodic "non-bypassable" fees. It was thought that NEM 2.0 would be subject to review in or after 2019, when a more permanent replacement for NEM 1.0 would be adopted.

The Commission initiated a proceeding in 2020 to "revisit" NEM 2.0 and issued its Decision adopting the successor tariff — which it calls a net billing tariff — in 2022. (Decision, *supra*, at p. 137.) The "foundation" for the successor tariff was the Net-Energy Metering 2.0 Lookback Study, January 21, 2021 (Lookback Study), an evaluation of NEM 2.0 by outside consultants

5

Verdant Associates, LLC that concluded "NEM 2.0 participants benefit from the structure, while ratepayers see increased rates." (Decision, at p. 207; Lookback Study, at p. 1.)

Drawing on the Lookback Study, the Commission found the NEM 2.0 tariff "negatively impacts non-participating ratepayers, disproportionately harms low-income ratepayers, and is not cost-effective." (Decision, *supra*, at pp. 2–3, 207.) The Commission explained this negative impact was caused by the "20-year legacy" of full retail rate compensation, which allowed NEM customers to avoid paying their proportionate share of the "infrastructure and other service costs"[2] associated with electrical service — because those costs are "embedded in" the rates charged for electricity — and shifted those costs to non-NEM customers. (*Id.* at pp. 47, 208.) The Commission found these shifted costs to be one of three drivers of high electricity rates (along with costs of transmission and distribution and wildfire mitigation). (*Id.* at p. 208.) And by equating the prices of imported and exported electricity, the Commission further found the NEM tariff had overcompensated customers for the electricity they supplied back to the grid, effectively paying such customers at a rate from "3.8 to 5.4 times" greater than the benefit conferred. (*Id.* at p. 216.)

Based on these and other findings, the Commission adopted the successor tariff. (Decision, *supra*, at pp. 137, 207–237.) The most fundamental change from the prior NEM tariff was that imported and exported power under the successor tariff are calculated separately (i.e., "no netting of consumption and production"), and customers are then billed for

---

[2] In addition to the costs of servicing customers and maintaining the power grid, these costs include funding for various public policy programs, such as those subsidizing utility service to low-income customers.

the difference between the *value* of the power imported and exported, rather than the difference in *quantity*. (*Id.* at p. 237.) In other words, imported and exported power are no longer treated as equivalent. (*Ibid.*)

Under the successor tariff, export compensation rates are based on values derived from the "Avoided Cost Calculator" (calculator), a tool developed earlier by the Commission " 'to determine the primary benefits of distributed energy resources.' " (Decision, *supra*, at pp. 59, 233, 237.) As set forth by the Commission, the calculator " 'calculates seven types of avoided costs: generation capacity, energy, transmission and distribution capacity, ancillary services, Renewables Portfolio Standard, greenhouse gas emissions, and high global warming potential gases.' " (*Id.* at p. 59.) The avoided costs determined in the calculator "are the utilities' marginal costs of providing electric service to customers" that "can be avoided when the demand for energy decreases because of distributed energy resources, and are, thus, the benefits of using distributed energy resources." (*Ibid.*)

The Commission stated the successor tariff "makes great strides in tackling the cost shift" to nonparticipating customers. (Decision, *supra*, at p. 170.) For participating customers, the Commission acknowledged the changes would likely reduce bill credits (as the price paid for exported power determined by the calculator is typically less than the full retail price), but they would still provide credits targeting a nine-year payback period on the upfront cost of a stand-alone solar system (or the equivalent of nearly $100 in monthly bill savings). (*Id.* at p. 77, Appendix at p. 2.)

To ease the transition and "ensure the sustainable growth of customer-sited renewable distributed generation," the Commission adopted a five-year "glide path" in the successor tariff. (Decision, *supra*, at pp. 4, 170.) The glide path consists of an "adder" to increase compensation rates for new residential

7

customers above the value determined by the calculator, with a stepdown over time so the path ultimately ends at the calculator-based values. (*Id.* at p. 148.) The glide path includes a higher adder for residential customers enrolled in the California Alternate Rates for Energy (CARE) program, resident owners of single-family homes living in disadvantaged communities, and residential customers who live in California Indian country. (*Id.* at pp. 158, 176.)

Finally, the Commission stated it would evaluate the successor tariff by collecting data for three years after its implementation and follow "a similar process as conducted in the Lookback Study, reviewing the entire successor tariff but with a focus on affordability, equity, and grid benefits." (Decision, *supra*, at p. 200.) According to the Commission, it is currently in the process of collecting such data.

Petitioners submitted an application for rehearing to the Commission, which was denied. (*Order Denying Rehearing of Decision 22-12-056* (2023) Cal. P.U.C. Dec. No. 23-06-056.) They filed a petition for a writ of review in this court. (§ 1756, subd. (a) [within 30 days after denial of application for rehearing, "any aggrieved party may petition for a writ of review in the court of appeal or the Supreme Court for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined"].) Petitioners argued the Decision was inconsistent with the objectives in section 2827.1(b)(1), (b)(3), and (b)(4). We granted the petition, and answers were filed by the Commission and real parties in interest.[3]

---

[3] Given the extensive record of exhibits lodged by petitioners, we declined to require the Commission to file an administrative record but permitted the parties to request supplementation. We grant the Commission's request to add the Assigned Commissioner's Scoping Memo

8

We affirmed the Decision. (*CBD I*, *supra*, 98 Cal.App.5th at p. 43, review granted.) In so doing, we used the standard set forth in *Greyhound*, concluded the successor tariff bore a reasonable relation to the purpose and language of section 2827.1, and concluded the Commission did not otherwise err. (*CBD I*, at p. 43; see *Greyhound*, *supra*, 68 Cal.2d at pp. 410–411 ["[C]ommission's interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language"].)

Petitioners subsequently presented the following issues in their petition for review to the California Supreme Court: whether the deferential standard of review in our opinion conflicted with law and identified a conflict in case law for resolution, and whether the Commission failed to proceed in a manner required by section 2827.1(b)(1) (that the Commission must "include specific alternatives designed for growth among residential customers in disadvantaged communities" in developing the successor tariff) and (b)(3) (that the Commission must ensure that the successor tariff is "based on the costs and benefits of the renewable electrical generation facility").

The Supreme Court noted petitioners had not raised the first issue in this court but addressed it given the absence of any objection and because the issue "presents a question of law of considerable statewide importance." (*CBD II*, *supra*, 18 Cal.5th at p. 301.) The court concluded the "highly deferential" approach of *Greyhound* no longer applies to the Commission's interpretation of the Public Utilities Code. (*CBD II*, at p. 299.) It explained that "[w]here, as here, the primary question is whether a state agency has

and Ruling, Rulemaking 22-11-013 (May 31, 2023) as it appears appropriate for inclusion in the administrative record. We otherwise deny the request, as it seeks inclusion of other material that postdates both the Decision and the order denying petitioners' application for rehearing.

acted in a manner consistent with the statute it purports to implement, judicial review typically differs meaningfully from the approach we described in *Greyhound*," and the "leading case concerning review of an agency's statutory interpretation" is *Yamaha.* (*CBD II*, at p. 305.)

The court declined to resolve whether our ultimate conclusion in *CBD I* — that the successor tariff is consistent with section 2827.1 — was correct or incorrect, leaving for us the question of whether the tariff should be upheld under the *Yamaha* standard. (*CBD II*, *supra*, 18 Cal.5th at pp. 299, 309.) The court reversed the judgment and remanded for further proceedings consistent with its opinion. (*Id.* at p. 309.) Supplemental opening and responding briefs have since been filed by petitioners, the Commission, and real parties in interest. (Cal. Rules of Court, rule 8.200(b).)

## DISCUSSION

The parties agree section 1757.1 governs the scope of our review because the successor tariff was adopted by the Commission through a rulemaking proceeding. (Compare § 1757 [scope of review "[i]n a complaint or enforcement proceeding, or in a ratemaking or licensing decision of specific application that is addressed to particular parties"] with § 1757.1 [scope of review "[i]n any proceeding other than a proceeding subject to the standard of review under Section 1757"].) Section 1757.1, subdivision (a) provides, in relevant part, that judicial review "shall not extend further than to determine," based on the entire record, whether the Decision "was an abuse of discretion," the Commission "has not proceeded in the manner required by law," or the Decision "is not supported by the findings." (*Id.* subd. (a)(1)–(2), (4).)

Most of petitioners' arguments, including those presented in their original petition and in their supplemental briefing after remand, seek

review pursuant to section 1757.1(a)(2).  That is, they contend the Commission failed to proceed in the manner required by section 2827.1(b)(1), (b)(3), and (b)(4) in developing and adopting the successor tariff.

As the Supreme Court explained in *CBD II*, the *Yamaha* standard governs our inquiry of whether the Commission has acted in a manner consistent with section 2827.1, the statute it purported to implement in developing and adopting the successor tariff.  (*CBD II*, *supra*, 18 Cal.5th at p. 305.)  *Yamaha* differentiated the scope of that inquiry on the "opposite ends of an administrative continuum," from "quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law' " to "[a]n agency interpretation of the meaning and legal effect of a statute." (*Yamaha*, *supra*, 19 Cal.4th at pp. 6, fn. 3, 7.)  On one end of the continuum, quasi-legislative regulations are "subject to a substantially narrower scope of review: 'If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end.' " (*CBD II*, at p. 305, quoting *Yamaha*, at pp. 10–11.)  On the other end of the continuum, "the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha*, at p. 7.)

We agree with the Commission that its Decision is a quasi-legislative administrative decision properly reviewed at that end of the *Yamaha* continuum.  "[Q]uasi-legislative rules are the substantive product of a delegated legislative power conferred on the agency." (*Yamaha*, *supra*, 19 Cal.4th at p. 8, italics omitted.)  Through its enactment of section 2827.1(b), the Legislature explicitly directed the Commission to develop a

11

tariff for eligible customer-generators with a renewable electrical generation facility and afforded the Commission with discretion to revise that tariff as appropriate to achieve statutory objectives. Pursuant to this directive, the Commission engaged in an extensive, yearslong rulemaking proceeding, instituting the proceeding in 2020 and issuing its Decision in 2022. During this proceeding, the Commission presented the Lookback Study, adopted guiding principles for the development of the successor tariff to reflect the objectives of section 2827.1, reviewed 19 proposals from parties, held 12 days of evidentiary hearings, and considered briefing and comments presented by a broad range of stakeholders. (Decision, *supra*, at pp. 10–11.)

Petitioners' contentions that the Commission failed to proceed in the manner required by section 2827.1(b)(1), (b)(3), and (b)(4) are thus subject to the "narrow" scope of review under *Yamaha*: specifically, whether the Commission's Decision developing and adopting the successor tariff "lay within the lawmaking authority delegated by the Legislature." (*Yamaha*, *supra*, 19 Cal.4th at p. 10.) But *Yamaha* instructs that "even quasi-legislative rules are reviewed independently for consistency with controlling law. A court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature. The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued." (*Yamaha*, at p. 11, fn. 4.)

Accordingly, we exercise our independent judgment in interpreting the provisions of section 2827.1. Our fundamental task is to give effect to the intended purpose of the statute, and we apply well-settled principles of construction. (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933–934 (*Cannabis Coalition*).) We begin with the words of

12

the statute themselves because " ' " 'they generally provide the most reliable indicator of legislative intent.' " ' " (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 634.)  We ascribe to words "their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory . . . scheme." (*Cannabis Coalition*, at p. 933.)  " ' "If the statutory language is clear and unambiguous our inquiry ends." ' " (*Lopez*, at p. 634.) But if any ambiguity remains, we may then consider extrinsic aids such as legislative history materials.  (*Cannabis Coalition*, at p. 934.)

With this framework in mind, we address petitioners' arguments regarding section 2827.1(b)(1), (b)(3), and (b)(4) in turn.

## I.

The objective set forth in section 2827.1(b)(1) contains two components for development of the successor tariff: that the Commission ensure that the successor tariff ensures customer-sited renewable distributed generation "continues to grow sustainably," and that the Commission include "specific alternatives designed for growth among residential customers in disadvantaged communities."  Petitioners argue the Commission failed to proceed in the manner required by each of these components.  They fail to persuade.

As a preliminary matter, the Commission contends petitioners' arguments regarding this first component of section 2827.1(b)(1) (as well as their arguments regarding § 2827.1(b)(4)) cannot be revisited on remand because petitioners did not seek Supreme Court review of those issues, and our prior opinion thus remains "law of the case" on those issues.  (*Santa Barbara County Water Agency v. All Persons & Parties* (1960) 53 Cal.2d 743, 745.)  But the Commission's cited authority suggests any such rule is not applicable given the procedural posture here.  (*Romo v. Ford Motor Co.* (2003)

13

113 Cal.App.4th 738, 744, fn. 1 [concluding certain points in original opinion were not affected by United States Supreme Court action and thus remained "law of the case"].) We originally concluded the successor tariff bears a reasonable relation to the purpose and language of the provisions in section 2827.1, but the Supreme Court reversed our judgment — concluding this "highly deferential" approach was no longer applicable — and remanded to us to address in the first instance whether the successor tariff should be upheld under the *Yamaha* standard. (*CBD I*, *supra*, 98 Cal.App.5th at p. 43, rev.gr.; *CBD II*, *supra*, 18 Cal.5th at pp. 301, 309.) Because application of that standard affects how we analyze the challenges raised here, we consider them anew.

Turning to the first component of section 2827.1(b)(1), petitioners do not suggest the successor tariff has halted all growth of customer-sited renewable distributed generation. Rather, they contend the term "continues" in section 2827.1(b)(1) should be interpreted in accordance with a dictionary definition " 'to maintain without interruption a condition, course, or action,' " and because the successor tariff created a significantly longer payback period for renewable systems by reducing bill savings — slowing the rate of growth — the tariff is inconsistent with the statute.

We are unpersuaded that using this dictionary definition gives proper effect to the purpose of section 2827.1(b)(1). The statutory phrase, in its entirety, requires the Commission to ensure the successor tariff ensures customer-sited renewable distributed generation "continues to grow *sustainably*." (Italics added.) The legislative history of section 2827.1[4]

---

[4] We deny as unnecessary the requests for judicial notice filed by petitioners on May 3 and July 31, 2023, the Commission on September 29, 2023, and real parties in interest on June 21, 2023 and January 12, 2026. These requests seek judicial notice of legislative history materials,

14

indicates what the Legislature meant when it added the term "sustainably." A bill analysis explained that, over the prior two decades, the NEM tariff had resulted in a "substantial subsidy" to participating customers and a shifting of costs to non-NEM customers. (Sen. Analysis, *supra*, at p. 7.) The Legislature estimated this cost shift to be "approximately $60 million." (*Ibid.*) Given the increasing number of participating customers over time — and the decreasing number of non-NEM customers bearing the resulting cost shift — it is clear the Legislature understood the NEM 1.0 tariff was not sustainable. We decline to interpret section 2827.1(b)(1), as petitioners urge, to require the Commission to ensure that the successor tariff preserves a subsidy (and resulting cost shift) the Legislature expressly sought to address. (Sen. Analysis, at p. 4.)

Section 2827.1(b)(1) must also be read alongside the surrounding subsections. (*Cannabis Coalition*, *supra*, 3 Cal.5th at p. 933.) Section 2827.1(b)(4) requires the Commission to ensure the total benefits and costs of the successor tariff to "all customers and the electrical system" are approximately equal. Legislative history shows the sustainability objective in section 2827.1(b)(1) was linked to the equity objective in section 2827.1(b)(4). The author of the bill enacting section 2827.1 described the successor tariff as "allowing [a] sustainable program, which ensures that the total benefits of the program to all customers and the electric system are

---

Commission decisions, and other agency documents, all of which are published. Such requests are unnecessary. " 'Citation to the material is sufficient.' " (*Wittenburg v. Beachwalk Homeowners Assn.* (2013) 217 Cal.App.4th 654, 665, fn. 4 [considering request for judicial notice of published Senate bill analysis as citation to material]; *Thornton v. California Unemployment Ins. Appeals Bd.* (2012) 204 Cal.App.4th 1403, 1410, fn. 3 [denying request for judicial notice of published agency recommendation].)

equal to the total costs." (Assem. Henry T. Perea, Fact Sheet on Assem. Bill No. 327, dated Aug. 28, 2013 (Fact Sheet) p. 2.)

Moreover, section 2827.1(b)(6) required the Commission to establish a transition period for customer-generators taking service under a NEM tariff prior to July 1, 2017, and to consider "a reasonable expected payback period based on the year the customer initially took service" in doing so. This is further confirmation that the Legislature did not intend to require the Commission to maintain the NEM tariff (and its resulting payback period) without interruption. In short, nothing in section 2827.1(b)(1) requires the Commission ensure the successor tariff would result in continued growth of customer-sited renewable distributed generation *at the same pace as before its adoption.*

As to the second component of section 2827.1(b)(1), petitioners contend the Commission failed to "include specific alternatives designed for growth among residential customers in disadvantaged communities." In its supplemental briefing after remand, the Commission maintains it addressed this requirement in two ways. First, the glide path in the successor tariff includes a higher adder for residential customers enrolled in the CARE program, resident owners of single-family homes living in disadvantaged communities, and residential customers who live in California Indian country. (Decision, *supra*, at pp. 158, 176.) Second, the Commission adopted a series of programs through rulemaking proceedings in 2017 and 2018 to promote the growth of renewable energy in disadvantaged communities. The Solar on Multifamily Affordable Housing Program (SOMAH), for example, provides financial incentives for the installation of solar systems on multifamily affordable housing properties. (See *Decision Adopting Implementation Framework for Assembly Bill 693 and Creating the Solar on*

16

*Multifamily Affordable Housing Program* (2017) Cal. P.U.C. Dec. No. 17-12-022, at pp. 9–10.)

Petitioners argue these earlier adopted programs are insufficient to satisfy section 2827.1(b)(1) because the Commission was required to adopt specific alternatives *in the successor tariff*. In other words, they contend the statute should be interpreted to require the Commission to have developed new alternatives at the same time it created the successor tariff. This interpretation is inconsistent with the plain language of the statute. Section 2827.1(b)(1) requires the *Commission* (not the successor tariff itself) to include specific alternatives designed for growth among residential customers in disadvantaged communities. We are not persuaded that the inclusion of specific alternatives adopted by the Commission through earlier rulemaking proceedings falls outside the lawmaking authority delegated by the Legislature.[5] (*Yamaha, supra*, 19 Cal.4th at p. 10.)

For the first time in their supplemental briefing after remand, petitioners alternatively argue the higher adder and earlier adopted programs are insufficient to satisfy section 2827.1(b)(1) because they focus on low-income households and not communities "defined by *geographic*, *public-health*, and *environmental-hazard* criteria." Specifically, they argue the term "disadvantaged communities" in section 2827.1(b)(1) should be interpreted to include those falling within the top 25 percent scoring areas of

---

[5] Given this conclusion, we reject any argument by petitioners that the Commission did not proceed in a manner consistent with section 2827.1(b)(1) because the "specific alternatives" requirement is plural. We similarly reject any argument that the earlier adopted programs cannot satisfy the requirement because they were not relied upon or mentioned in the Decision. The Decision makes multiple references to SOMAH, including a finding that evaluation of the program "could be useful in determining future changes to the tariff." (Decision, *supra*, at pp. 227, 174, 182, 236.)

"CalEnviroScreen," a screening methodology developed by an office of the California Environmental Protection Agency to identify communities disproportionately burdened by pollution. (Cal. Office of Environmental Health Hazard Assessment, CalEnviroScreen 4.0 (Oct. 2021) p. 8.)

As a preliminary matter, petitioners have not explained why this argument is not forfeited. (Cf. *Unzueta v. Akopyan* (2022) 85 Cal.App.5th 67, 78, fn. 8 [declining to find forfeiture where new argument was made in response to issue raised on remand].) Even if not forfeited, there is nothing in section 2827.1(b)(1) that suggests the term "disadvantaged communities" *must* be defined to include the communities specified by petitioners. And in any event, the Commission explains that the higher adder *does* apply to those communities: resident owners of single-family homes living in "disadvantaged communities" include those "among the top 25 percent of communities statewide" identified by CalEnviroScreen (with the exception of the Community Solar program). (Decision, *supra*, at p. 176; *Alternate Decision Adopting Alternatives to Promote Solar Distributed Generation in Disadvantaged Communities* (2018) Cal. P.U.C. Dec. No. 18-06-027, at p. 96.)

Petitioners also raised several arguments regarding section 2827.1(b)(1) in their original petition that they do not appear to maintain in their supplemental briefing on remand. But given the nature of such briefing — and petitioners' raising of an issue in the Supreme Court that they failed to raise when previously before us — we address them in an abundance of caution. (Cal. Rules of Court, rule 8.200(b) ["Supplemental briefs must be limited to matters arising after the previous Court of Appeal decision in the cause, unless the presiding justice permits briefing on other matters"].)

Petitioners contend the higher adder fails to provide a sufficient alternative for growth because it underestimated the cost of installing solar

in disadvantaged communities.  To the extent this raises a challenge under section 1757.1(a)(2) (that the Commission failed to proceed under manner required by law), we see nothing in section 2827.1(b)(1) that mandates any specific *amount* of growth among residential customers in disadvantaged communities, or that such growth must be equivalent to growth for other customers.  To the extent this raises a challenge under section 1757.1(a)(4) (that the Decision is not supported by the findings), the Commission found a value of $3.30 per watt for the cost of solar used in calculating the higher adder to be reasonable as the adopted 2023 cost of solar, and expressly rejected petitioners' proposed $4.28 value because it was derived from a materially different solar incentive program.  (Decision, *supra*, at pp. 82–84.) Petitioners offer no basis to review the sufficiency of evidence supporting this finding.  (See § 1757.1(c) [factual findings are "final and shall not be subject to review" except as otherwise provided in statute]; *California Community Choice Assn. v. Public Utilities Com.* (2024) 103 Cal.App.5th 845, 854 [explaining § 1757.1 includes grounds for judicial review in § 1757 "except for the fourth ground authorizing a substantial evidence review of the Commission's findings"].)

Finally, petitioners contend the Commission otherwise failed to proceed in the manner required by section 2827.1(b)(1) because it did not create an equity fund, which would use a billing surcharge imposed through the successor tariff to assist low-income customers in acquiring renewable systems, and it deferred consideration of community solar systems upon finding such consideration "premature."  (Decision, *supra*, at p. 188.)  But nothing in section 2827.1(b)(1) suggests the Commission was required to include any *particular* "alternatives" to ensure growth of renewable energy in disadvantaged communities.  Importantly, our interpretation does not

19

suggest the Commission was barred from considering such alternatives (or would be precluded from revisiting them in the future after, for example, reviewing data from the initial implementation of the successor tariff). But the statutory language here dictates that the Commission's development of the successor tariff be measured by what it did include, rather than by what it did not. Petitioners have not shown that such development lay outside the lawmaking authority delegated by the Legislature. (*Yamaha, supra,* 19 Cal.4th at p. 10.)

In sum, we conclude the Commission did not fail to proceed in the manner required by section 2827.1(b)(1) or otherwise err when it adopted the successor tariff.

## II.

Section 2827.1(b)(3) requires the Commission to ensure the successor tariff "is based on the costs and benefits of the renewable electrical generation facility." The original petition argued the Commission failed to proceed in the manner required by section 2827.1(b)(3) because the calculator focuses on economic benefits conferred on the grid by exported power and fails to account for "several acknowledged benefits" of distributed renewable generation.[6] Specifically, petitioners cited four purported "societal" benefits: resiliency, avoided out-of-state methane leakage, avoided land use impacts, and avoided transmission costs.

---

[6] In analyzing this argument, we need not address petitioners' citation to generalized principles regarding cost-benefit analysis by an administrative agency. (*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.* (9th Cir. 2008) 538 F.3d 1172; *Golden Hill Neighborhood Assn., Inc. v. City of San Diego* (2011) 199 Cal.App.4th 416.) We find these cases inapposite, as section 2827.1 provides the framework governing the Commission's Decision here.

20

As a preliminary matter, we clarify that section 2827.1(b)(3) refers to the costs and benefits of "the renewable electrical generation facility," not distributed renewable generation more generally. But even applying petitioners' argument to the correct statutory category of costs and benefits, we are not persuaded that petitioners have shown the Commission's Decision fell outside its lawmaking authority delegated by the Legislature. (*Yamaha, supra,* 19 Cal.4th at p. 10.)

First, the original petition described increased resiliency as "the ability to maintain power during a blackout or other grid disruption," including to cool one's home during a heat wave and prevent food spoilage due to loss of refrigeration. The Commission declined to adopt the suggestion that this purported increased resiliency be included in the calculator for valuing excess power. (Decision, *supra,* at p. 69.) It explained that proponents had only provided examples of such benefits that were private, highly speculative, and/or limited to unique circumstances. (*Ibid.*)

Second, the original petition identified the avoidance of methane leakage in other states that occurs when the utilities' need for production and transmission of out-of-state natural gas is reduced by the export of excess power. The Commission explained that in-state methane leakage was already accounted for in the calculator but declined to include out-of-state methane leakage because it did not decrease regulatory compliance costs for utilities and ratepayers. (See Decision, *supra,* at p. 70; *Decision Adopting Changes to the Avoided Cost Calculator* (2022) Cal. P.U.C. Dec. No. 22-05-002, at pp. 46–47 (ACC Decision).) Recognizing "greenhouse gas emissions know no state boundary," however, the Commission had authorized continued monitoring and update of the issue during the next update of the calculator. (ACC Decision, at p. 47.)

Third, the original petition described avoided land use impacts from "reduced transmission projects" (i.e., rooftop solar versus utility-scale solar) due to distributed generation. The Commission again declined to include this suggestion in the calculator because its proponents had failed to "offer any evidence that increased net energy metering installations will directly result in decreased utility scale projects," especially given analysis presented to the Commission that a reduction in the rate of growth of customer-side solar (contemplated with adoption of the successor tariff) would mean the need for utility-scale solar " 'remains virtually the same.' " (Decision, *supra*, at pp. 70–71.)

In each of these instances, the Commission considered but ultimately declined to include the purported benefit in the calculator because there was insufficient evidence at the time of its Decision that there was an actual benefit to customers and/or the electrical system. Nothing in the language of section 2827.1(b)(3) suggests the Commission was required to do otherwise. Indeed, the legislative history of section 2827.1 makes clear that the Legislature intended to provide the Commission with "flexibility to implement fair and reasonable reforms, in line with the state's energy policy goals and objectives." (Assem. Henry T. Perea, Assem. Bill No. 327 Press Release Aug. 30, 2013.) Effectuating that intent, section 2827.1(b) explicitly provides a mechanism for the Commission to revise the tariff "as appropriate to achieve the objectives of this section." We see no reason why this provision would not include future revisions to the tariff based on new or additional evidence regarding the costs and benefits of renewable electrical generation facilities.

Fourth, the original petition argued that the calculator fails to fully account for transmission costs avoided because of exported energy. The

22

Commission reviewed competing proposals for a methodology to estimate avoided transmission costs, adopting the one it deemed most reasonable and authorizing further review and analysis of avoided transmission costs to aid in the development of improved methods to estimate such costs. (ACC Decision, *supra*, at pp. 73–75.) Petitioners have not shown that the Commission's methodology falls outside its lawmaking authority delegated by the Legislature. (*Yamaha*, *supra*, 19 Cal.4th at p. 10.) The original petition did not propose any alternative estimation methodology. Instead, it presumed that the calculator undervalued avoided transmission costs by comparing its $481 million projection of such costs for the three major public utilities during the period 2021–2025 with a Commission report in the record identifying a regulatory category called "transmission revenue requirements" that exceeded $4 billion for the three utilities in 2021. But an examination of that report makes clear that the regulatory category sweeps much broader than costs avoided by the export of energy from renewable systems, including, for example, "wildfire mitigation work, including enhanced inspections and vegetation management efforts."

The original petition also argued that the Commission failed to proceed in the manner required by section 2827.1(b)(3) because the successor tariff treats reduced use of grid-supplied energy by NEM customers as a cost rather than a benefit and penalizes them when they reduce their electric bill. We disagree. Consumer-generators are billed for the energy they import, regardless of the degree to which they reduce their use of imported energy. In this way, the successor tariff makes no attempt to address any cost shift that results solely from the reduction in those customers' use of imported energy. Instead, it remedies only the cost shift that occurred when the NEM tariff permitted consumer-generators to avoid paying for imported energy by

23

offsetting exported energy against it. The Legislature clearly contemplated and wanted a successor tariff that would prevent this shift. (Sen. Analysis, *supra*, at p. 4.)

The original petition lastly argued that the Commission improperly dismissed an alternative test for evaluating distributed energy resources, known as the "Societal Cost Test." The Commission found it "premature" to apply the Societal Cost Test because it was still under development by the Commission at that time. (Decision, *supra*, at p. 211.) Petitioners have not shown that the Commission's methodology fell outside its lawmaking authority delegated by the Legislature. (*Yamaha*, *supra*, 19 Cal.4th at p. 10.) Section 2827.1(b)(3) does not specify *how* the Commission should determine the costs and benefits of renewable electrical generation facilities, let alone require the Commission adopt a particular methodology not fully developed at the time of its Decision. As detailed above, the Legislature intended to provide the Commission with flexibility and we see no reason why its discretion under section 2827.1(b) would not include future revisions to the tariff based on new or additional methodology regarding the costs and benefits of renewable electrical generation facilities.[7]

For the first time in their supplemental briefing after remand, petitioners argue that the successor tariff is based on the utilities' avoided costs, and it fails to account for the benefits "that accrue when customer-

---

[7] In its briefing before the Supreme Court, the Commission stated it has "long acknowledged the possibility of including certain societal effects in its cost-benefit analyses" and that the Societal Cost Test (finalized in 2024) will be an "informative tool going forward." The Decision also indicated the Commission "may consider" resiliency benefits at a future time, given "evolving analysis and changing grid conditions." (Decision, *supra*, at pp. 69–70.) Nothing about our interpretation of section 2827.1(b)(3) forecloses such consideration.

generators invest in private facilities to generate and use renewable energy on-site." Petitioners have not explained why this argument is not forfeited. (*Unzueta v. Akopyan*, *supra*, 85 Cal.App.5th at p. 78, fn. 8.) Even if not forfeited, we are not persuaded that petitioners have shown the Commission's Decision fell outside its lawmaking authority delegated by the Legislature. (*Yamaha*, *supra*, 19 Cal.4th at p. 10.)

As to the argument that the successor tariff is improperly based on the utilities' avoided costs, the Commission adopted a methodology that considered the benefit of the renewable electrical generation facility in reducing utilities' costs for providing electricity that would *otherwise be recouped* from customers through electricity rates. (Decision, *supra*, at p. 59.) As petitioners acknowledge, "Ratepayers are on the hook for all of the utilities' spending." The Legislature understood the connection between the utilities' avoided costs and the costs and benefits of renewable electrical generation facilities when it enacted section 2827.1 and directed the Commission to develop a successor tariff that prevented the shifting of utility costs to certain customers. (Sen. Analysis, *supra*, at p. 4.)

Moreover, petitioners do not sufficiently describe the purported benefits of "customer-generators invest[ing] in private facilities to generate and use renewable energy on-site" or how they differ from the "societal benefits" raised in their original petition. For example, petitioners contend that generation and use of on-site power reduces the demand for electricity during hot days and stabilizes California's energy supply infrastructure. These purported benefits resemble the resiliency benefit presented in the original petition, which the Commission declined to include in the calculator because proponents had only provided examples of such benefits that were private, highly speculative, and/or limited to unique circumstances. (Decision, *supra*,

25

at p. 69.)  Petitioners' supplemental briefing cites no evidence regarding *any* of these benefits.  Under these circumstances, we cannot conclude that the Commission's Decision fell outside its lawmaking authority delegated by the Legislature.  (*Yamaha, supra,* 19 Cal.4th at p. 10.)

Petitioners also argue that on-site generation of renewable energy provides a benefit by generating "electricity that ratepayers are not on the hook for."  The Decision explains that the calculator *does* consider this benefit in terms of costs utilities may avoid when customers use their renewable electrical generation facility to meet their consumption needs.  (Decision, *supra,* at p. 59 [noting "avoided costs determined in the Avoided Cost Calculator are the utilities' marginal costs of providing electric service to customers" and "can be avoided when the demand for energy decreases because of distributed energy resources"].)  But as directed by the Legislature, the successor tariff does not *overvalue* that benefit at the expense of nongenerating customers.  (Sen. Analysis, *supra,* at p. 4.)  Inflating the benefits of customer-generators to the detriment of nongenerating customers would be contrary to the purpose of section 2827.1.

Petitioners appear to suggest otherwise by pointing to "the history of the Legislature's efforts to promote customer-generated renewable electricity."  Specifically, petitioners rely on the express findings and declarations made by the Legislature in 1995 when it enacted former section 2827, subdivision (a), including that net energy metering "is one way to encourage private investment in renewable energy resources."  But the legislative history of section 2827.1 shows why such reliance is misplaced.  The author of the bill explained the Commission would be required "to develop a new structure for Net Energy Metering (NEM) *unconstrained* by existing law (PUC code, Section 2827) governing the existing NEM program."

26

(Fact Sheet, *supra*, at p. 2, italics added.)  Accordingly, we decline petitioners' invitation to import legislative findings and declarations from section 2827 to section 2827.1, especially when it would alter the statutory objectives set forth in section 2827.1(b).

In sum, we conclude the Commission did not fail to proceed in the manner required by section 2827.1(b)(3) or otherwise err when it adopted the successor tariff.

## III.

Section 2827.1(b)(4) requires the Commission to ensure the "total benefits" of the successor tariff "to all customers and the electrical system are approximately equal to the total costs."  The original petition argued the Commission failed to proceed in the manner required by section 2827.1(b)(4) because its cost-effectiveness analysis improperly placed the interests of nonparticipating customers over "cost-effectiveness to the electrical system as a whole."  We disagree.

The Lookback Study used certain cost-effectiveness tests from the Commission's Standard Practice Manual.  (Decision, *supra*, at p. 14.)  This included the Total Resources Cost (TRC) test, which "measures the net costs of a demand-side management program as a resource option based on the total costs of the program, including both the participants' and the utility's costs."  (Decision, at p. 15, fn. 17.)  It also included the Ratepayer Impact Measure (RIM) test, which "measures what happens to customer bills or rates due to changes in utility revenues and operating costs caused by a program."  (Decision, *id.* at fn. 18.)

Contrary to petitioners' characterization, the adoption of a successor tariff that bases its export compensation rates on the value of the power exported — rather than providing an offset based on quantity alone — did

27

not constitute an improper focus on nonparticipating customers. (Decision, *supra*, at p. 237.) The Legislature recognized the offset used in NEM 1.0 was inequitable because it shifted costs to non-NEM customers. (Sen. Analysis, *supra*, at p. 4.) In response, section 2827.1(b)(4) directs the Commission to ensure the total costs and benefits to *all customers* (and the electrical system) are approximately equal. The clear implication of that language is to ensure the successor tariff does not grant unwarranted benefits to, or impose unwarranted costs on, *any* particular group of ratepayers. Moreover, the TRC test *did* consider the costs to the electrical system as a whole. (Decision, at pp. 62–63 ["the TRC test has the ability to indicate whether a demand side program is cost-effective to the grid relative to other resource options"].) Petitioners have not shown that the Commission's cost-effective analysis fell outside its lawmaking authority delegated by the Legislature. (*Yamaha*, *supra*, 19 Cal.4th at p. 10.)

The original petition also argued that the Commission did not proceed in the manner required by section 2827.1(b)(4) and erred or abused its discretion because the successor tariff "dramatically reduce[d]" compensation for nonresidential customers without support from findings. (§ 1757.1, subds. (a)(1)–(2), (4).) Again, we disagree.

The Lookback Study explained that the NEM 2.0 tariff had TRC test results for nonresidential customers averaging 1.25, where a score of 1.00 represents no net cost or benefit. (Decision, *supra*, at pp. 48–49.) Accordingly, under the TRC test, the nonresidential NEM 2.0 tariff conferred a fairly small net benefit on the electrical system and was thus cost-effective for these market segments. (*Id.* at p. 49.) But the Commission declined to adopt this conclusion because it found the nonresidential NEM 2.0 tariff performed poorly on the RIM test: it earned an average score of .57,

indicating an increase in rates for all customers and an increase in bills for nonparticipating customers. (*Id.* at pp. 48–50.) Given the equity objective in section 2827.1(b)(4), and the RIM test's usefulness in "examining whether disproportionate impacts occur on non-participants," the Commission placed "more weight" on the RIM test results and found the nonresidential NEM 2.0 tariff was not cost-effective. (Decision, at p. 50.)

Petitioners appear to contend the Commission should have accepted the cost-effectiveness conclusion from the TRC test because it is designated as the " 'primary test' " in the Standard Practice Manual. But the TRC test measures cost-effectiveness *for the electrical system*. Section 2827.1(b)(4), however, does not require the successor tariff to be cost-effective only for the electrical system. Instead, it requires the Commission ensure the total costs and benefits of the successor tariff "to *all customers* and the electrical system" are approximately equal. (*Ibid.*, italics added.) Consistent with this directive, the Commission considered test results showing the nonresidential NEM 2.0 tariff failed to equalize costs and benefits among customers.

Petitioners also appear to contend that nonresidential customers "pay far more in utility bills than the actual cost to provide them energy from the grid." The intended significance of this contention is unclear. Section 2827.1(b)(4) directs the Commission to devise a successor tariff that balances the total costs and benefits across all customers and the electrical system. It does not require the Commission to ensure no customers were charged more by the utilities than the cost to serve them.

Finally, in their supplemental briefing after remand, petitioners argue for the first time that the Commission failed to proceed in the manner required by section 2827.1(b)(4) because the successor tariff is based on the utilities' avoided costs and fails to quantify benefits of the tariff to all

29

customers and the electrical system. Petitioners have not explained why this argument is not forfeited. (*Unzueta v. Akopyan, supra,* 85 Cal.App.5th at p. 78, fn. 8.) Even if not forfeited, we remain unpersuaded that petitioners have shown the Commission's Decision fell outside its lawmaking authority delegated by the Legislature. (*Yamaha, supra,* 19 Cal.4th at p. 10.)

The Legislature made clear that the equity objective of section 2827.1(b)(4) was to "ensure[] that the total benefits of the program to all customers and the electric system are equal to the total costs." (Fact Sheet, *supra,* at p. 2.) As explained above, the successor tariff based export compensation rates on values derived from the calculator, which determined utilities' avoided costs for providing electricity that would *otherwise be recouped* from customers through electricity rates. (Decision, *supra,* at pp. 59, 233, 237.) The Legislature understood the role of utilities' avoided costs in ensuring the costs and benefits of the successor tariff were equitable across all customers and the electrical system. (Sen. Analysis, *supra,* at p. 4.) It enacted section 2827.1 to prevent the continuation of a decades-long shift of utilities' costs from NEM to non-NEM customers. (Sen. Analysis, at p. 4.)

And petitioners do not sufficiently describe the benefits of the tariff that the Commission purportedly failed to quantify. Instead, they make vague reference to benefits of the renewable electrical generation facility cited in their section 2827.1(b)(3) argument, including benefits of consumers generating renewable energy on-site and other "societal" benefits. We do not see how recharacterizing these as benefits of the tariff shows the Commission's Decision fell outside its lawmaking authority delegated by the Legislature. (*Yamaha, supra,* 19 Cal.4th at p. 10.) As explained above, the tariff *did* account for the benefits of consumers' renewable electrical generation facility to meet their consumption needs but balanced it in

30

consideration of the total benefits and costs to *all* consumers and the electrical system.  (Decision, *supra,* at p. 59.)  And like section 2827.1(b)(3), nothing in section 2827.1(b)(4) requires the Commission to have balanced the four "societal" benefits identified in the original petition when there was insufficient evidence at the time of its Decision of an actual benefit to customers and/or the electrical system.  Nor does it preclude the Commission from revising the tariff in the future upon new or additional evidence regarding the total benefits and costs of the tariff to all customers and the electrical system.

In sum, we conclude the Commission did not fail to proceed in the manner required by section 2827.1(b)(4) and did not otherwise err or abuse its discretion when it adopted the successor tariff.

## DISPOSITION

The Decision is affirmed.  The Commission and real parties in interest shall recover their costs in this proceeding.  (Cal. Rules of Court, rule 8.278(a)(1)–(2).)

31

_____
RODRÍGUEZ, J.

WE CONCUR:

_____
TUCHER, P. J.

_____
PETROU, J.

A167721; *Center for Biological Diversity, Inc. v. P.U.C.*

Malinda R. Dickenson; Complex Appellate Litigation Group and Steven A. Hirsch for Petitioners The Protect our Communities Foundation and Environmental Working Group.

Roger Lin and Anchun Jean Su for Petitioner Center for Biological Diversity, Inc.

Samuel T. Harbourt, Mica L. Moore and Sophia Park for Respondent.

Munger, Tolles & Olson, Henry Weissmann, L. Ashley Aull and Rebecca Hansen for Real Parties in Interest Pacific Gas and Electric Company, San Diego Gas & Electric Company, and Southern California Edison Company.

Ashley E. Merlo for Real Party in Interest Pacific Gas and Electric Company.

E. Gregory Barnes for Real Party in Interest San Diego Gas & Electric Company.

Rebecca Meiers-De Pastino for Real Party in Interest Southern California Edison Company.